# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

United States of America,                                    Crim. No. 15-164 (DSD/BRT)

               Plaintiff,

v.                                                                       **REPORT AND**
                                                                         **RECOMMENDATION**

Sharrod Juanel Rowe (4),

               Defendant.

---

LeeAnn K. Bell, Esq., United States Attorney's Office, counsel for Plaintiff.

Rick L. Petry, Esq., The Petry Law Firm; and Albert T. Goins, Sr., Esq., Goins Law Offices, Ltd., counsel for Defendant.

---

      Defendant Sharrod Juanel Rowe has, along with Houston Oliver, James Green, and Desmond Williams, been indicted by a grand jury for conspiring to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846. (Doc. No. 114, Superseding Indictment.) This matter is currently before the Court on Rowe's pretrial motions to dismiss the superseding indictment against him and suppress evidence and statements. (*See* Doc. No. 148, Def.'s Mot. to Dismiss Indictment; Doc. No. 162, Def.'s Am. Mot. to Suppress Statements, Admissions and Answers; Doc. No. 163, Def.'s Am. Mot. to Suppress Evid.) An evidentiary hearing was held on January 13, 2016, during which the government introduced several exhibits and proffered the testimony of Minneapolis Police Sergeant John Biederman and Minnesota State Trooper Megan Thul. (*See* Doc.

Nos. 169, 179.) For the reasons stated below, this Court recommends that Rowe's

motions to dismiss the indictment and to suppress evidence and statements be denied.

## I.  FACTUAL BACKGROUND

On November 25, 2014, Minneapolis Police Sergeant John Biederman was

contacted by a known confidential informant ("CI") who, over the course of several

years, had provided law enforcement with reliable information leading to arrests and

felony convictions. (*See* Doc. No. 179, 1/13/16 Mot. Hr'g Tr. ("Tr.") 41–42, 70; Doc.

No. 169, 1/13/16 Hr'g, Gov. Ex. 1 at 2.) The CI advised Biederman that Houston Oliver

would, with the help of James Green and Desmond Williams, be shipping cocaine

packaged in silverware boxes from a particular post office in Maricopa, Arizona, to

Minneapolis via two-day priority mail. (*See* Tr. 42–44; Gov. Ex. 1 at 2.) Biederman and a

fellow investigator, Officer Danielle Evans, forwarded that information to a Minneapolis

postal inspector, who intercepted two priority-mail packages fitting the CI's description

and addressed in seemingly identical handwriting. (Tr. 42, 44–45; Gov. Ex. 1 at 2.) After

securing a warrant to search the packages, the postal inspector discovered that each

contained a little over two kilograms of cocaine concealed inside a silverware box, just as

the CI had predicted. (Tr. 45–46; Gov. Ex. 1 at 2.)

Over the coming days, the police received additional information from the CI that

a large quantity of cocaine would be transported from Arizona to Minnesota in a gray

BMW owned by Oliver; the drugs were slated to arrive in Minneapolis on November 30,

2014. (Tr. 47–48; Gov. Ex. 1 at 2.) A records check confirmed that Oliver owned a 2002

BMW with Minnesota plates 672CAZ. (Tr. 48–49; Gov. Ex. 1 at 2.) Investigators also

interviewed Desmond Williams, who corroborated the CI's information about the intercepted shipments of cocaine, indicated that Oliver had packaged the drugs at an Arizona home, and admitted that he and Green had each dropped off a package at the post office. (*See* Tr. 46–47, 70–72; Gov. Ex. 1 at 2.) Based on the CI's tip, Sergeant Biederman issued an alert about the BMW's possible involvement in narcotics trafficking; law enforcement officials, including Minnesota State Trooper Megan Thul, surveilled Interstate 35W in Minneapolis in an effort to intercept the car. (*See* Tr. 49, 81, 92; Gov. Ex. 1 at 2.) If the BMW was located, Sergeant Biederman's plan was to stop it, impound it, and then obtain a warrant to search it for drugs. (Tr. 72.)

At the start of her shift on November 30, 2014, which began around 3:00 p.m., Trooper Thul received a computerized alert from police dispatch regarding the BMW's suspected involvement in drug trafficking, along with a description of the car and its license plate number. (Tr. 92–96, 98.) Later that evening, shortly before 10:00 p.m., Thul learned that investigators had located the BMW in Minneapolis and was ordered to stop the vehicle. (Tr. 81, 96.) After spotting the BMW heading northbound on the interstate, Thul followed it for several minutes. (*See* Tr. 81, 83; Gov. Ex. 8.) Despite being ordered to stop the BMW as part of the ongoing narcotics investigation, Thul wanted to conduct a "parallel investigation" and develop her "own basis" for making a traffic stop, consistent with her standard practice. (Tr. 82, 100.) After concluding that the BMW's windows were illegally tinted, she pulled the car over. (*Id.* at 81–83.) Soon after, Officer Christopher Wegner of the Bloomington Police Department arrived on the scene in his

own squad car. (*See* Gov. Exs. 8–9.) Rowe was the driver and sole occupant of the BMW when it was stopped.[1] (*See* Tr. 83; Gov. Exs. 8–9.)

Trooper Thul asked Rowe a series of routine traffic stop questions for approximately six minutes, most of which concerned his travel itinerary and possession of the BMW. (*See* Tr. 83; Gov. Ex. 8.) Rowe initially stated that he was traveling to his home in Eagan, Minnesota, which happened to be in a direction opposite to that in which he was driving, only to change course by stating that he was heading to his girlfriend's home in South Minneapolis. (*See* Tr. 84; Gov. Exs. 8–9.) He also indicated that the BMW belonged to a friend named Houston, who owned homes in both Arizona and Minnesota, and that he was driving the car from Arizona on Houston's behalf. (*See* Gov. Exs. 1, 8–9.) Rowe's "stuttering" and seemingly inconsistent responses sparked Thul's suspicions. (*See* Tr. 84; Gov. Ex. 9.) She therefore asked Officer Wegner to see "if [he got] the same answers out of [Rowe]" while she ran his driver's license and checked for outstanding warrants. (Gov. Ex. 9; *see also* Tr. 86–87.) Thul advised Wegner, "I'm gonna go start his warnings so we're not detaining him longer than necessary." (Gov. Ex. 9; *see also* Tr. 91.) Wegner proceeded to question Rowe for roughly four minutes, conferred with Thul, and then resumed his questioning for another three minutes after Thul indicated that she was "still doing . . . [her] paperwork." (*See* Gov. Exs. 8–9.) Wegner again conferred with Thul, who stated that it would "take [her] a while" to complete her paperwork, and was advised by investigators that the BMW would be impounded based on the probable cause

---

[1]     Video recordings of the traffic stop were captured by both Trooper Thul and Officer Wegner; the videos are included in the record as government exhibits 8 and 9.

supplied by the CI's tip. (Tr. 72, 91, 99, 111; Gov. Ex. 9; *see also* Doc. No. 107, 8/25/15

Mot. Hr'g Tr. ("8/25/15 Tr.") 82–83.[2])

Approximately twenty-five minutes into the stop, and after he refused to consent

to a search of the BMW, Rowe was removed from the vehicle, handcuffed, and placed in

the back of Officer Wegner's squad car. (*See* Tr. 64, 76, 88–90, 102–03; Gov. Exs. 8–9.)

At the time, Thul was still completing her paperwork. (Tr. 89.) While awaiting the arrival

of a tow truck to take the BMW to an impound lot, other officers who had arrived on the

---

[2]       At the hearing, Rowe was advised that the Court might rely on evidence produced
at his codefendants' earlier suppression hearing, including the testimony of Officer
Danielle Evans and Trooper Thul regarding the BMW stop, and was given an opportunity
to cross-examine both Thul and Biederman on topics covered at the earlier hearing. (*See*
Tr. 113, 115–16.) Although Rowe had an opportunity to review the prior testimony of
Thul and Evans, he objected to the Court relying on that testimony, stating that "unless
there's some [] authority" to do so, he did not believe that it "should be admissible for the
purpose of this hearing." (Tr. 116–18.) There is such authority and, generally speaking, a
court may rely on testimony and other evidence introduced at a codefendant's related
proceeding without implicating the Sixth Amendment's Confrontation Clause, provided
that the defendant, as here, is given a reasonable opportunity to respond to that evidence.
*See United States v. Blackwell*, 49 F.3d 1232, 1236–37 (7th Cir. 1995) (noting that "more
than one circuit has condoned reliance on evidence from related trial proceedings of
codefendants," provided that the court gives the defendant a reasonable opportunity to
respond to the evidence); *Logan v. United States*, 208 F.3d 541, 544 (6th Cir. 2000) ("A
district court is indeed permitted to rely on testimony presented at a related proceeding . .
. ."); *see also United States v. Thompson*, 533 F.3d 964, 969 (8th Cir. 2008) (explaining
that "the district court may rely on hearsay evidence at a suppression hearing" and that
"[t]he right of confrontation does not apply to the same extent at pretrial suppression
hearings as it does at trial" because the "interests at stake in a suppression hearing are of
a lesser magnitude than those in the criminal trial itself") (quotations omitted); *United
States v. Mitchell-Hunter*, 663 F.3d 45, 51 (1st Cir. 2011) (noting that "[t]he right to
confrontation is basically a trial right" and citing "extensive case law declining to apply
the confrontation right to various pre- and post-trial proceedings") (quotation omitted). In
any event, the testimony presented at the earlier suppression hearing, aside from
providing some additional context surrounding the BMW stop, was identical to that
offered at Rowe's hearing. Even in the absence of that prior testimony, this Court would
arrive at the same conclusions and recommendations.

scene searched the vehicle's passenger compartment and trunk. (*See* Gov. Ex. 8.) They also used a drug-sniffing dog, which alerted to the possible presence of narcotics inside a speaker in the trunk. (*See* Tr. 108–10; Gov. Ex. 8; *see also* 8/25/15 Tr. 70–71, 94.) Notwithstanding the canine alert, the speakers were not searched at that time and no drugs were recovered during the roadside search of the BMW. (*See* Tr. 70; Gov. Ex. 8; 8/25/15 Tr. 84–85.) Meanwhile, while sitting alone in the back of Officer Wegner's squad car, which had its video camera turned on, Rowe twice muttered to himself, "somebody told on us." (Gov. Ex. 9; *see also* Tr. 105–06.) The BMW was towed to an impound lot just under an hour after it was first stopped and Rowe was taken to Minneapolis' Fifth Precinct, where he was questioned by investigators and then released. (*See* Tr. 62–63, 114; Gov. Exs. 8–9.)

Two days later, on the morning of December 2, 2014, Sergeant Biederman secured a warrant to search the impounded BMW for narcotics, cell phones, and other items possibly related to drug trafficking. (Gov. Ex. 1.) In his affidavit in support of the search warrant, Biederman detailed the CI's information regarding the BMW and the intercepted packages of cocaine, as well as Williams' corroborative statements concerning the packages and those involved. (*Id.* at 2.) He also attested to the CI's reliability, noting that the informant had provided "accurate, timely, and verifiable" information "[o]ver the last several years" that resulted in evidence, arrests, and felony convictions. (*Id.*) Biederman's affidavit indicated that the BMW had been impounded after it was stopped on November 30, 2014, but did not mention that the car had been searched on the side of the highway and that a canine had alerted to the possible presence of narcotics. (*Id.* at 1–2.) While

executing the search warrant, officers found six kilograms of cocaine hidden inside a

speaker in the BMW's trunk. (*See* Gov. Ex. 1 at 5; Doc. No. 92, 8/25/15 Hr'g, Gov. Exs.

2 & 6; 8/25/15 Tr. 100.) Rowe's cell phone was also seized, though it is unclear from the

record whether it was recovered around the time of the initial traffic stop or during the

execution of the search warrant.[3] (*See* Gov. Ex. 1 at 5; Gov. Ex. 6 at 2.) Officer Evans

later obtained a warrant to search the contents of the various cell phones recovered by the

police during the drug investigation into Oliver, Green, Rowe, and Williams. (*See* Gov.

Ex. 6.)

---

[3]     The government asserts that Rowe's cell phone was seized pursuant to the
December 2, 2014 search warrant for the BMW, while Rowe suggests that the cell phone
was either seized on November 30, 2014, or during the execution of the search warrant.
(*See* Doc. No. 174, Def.'s Mem. in Supp. of Mots. to Suppress 1, 9; Doc. No. 177,
Gov't's Post-Hr'g Resp. to Def.'s Mots. to Suppress 11.) The evidence in the record
suggests that nothing was seized from the BMW while it was searched on the side of the
highway on November 30, 2014. (*See* Tr. 70; Gov. Ex. 8; 8/25/15 Tr. 84–85.) The only
specific reference to Rowe's cell phone in the record appears in Officer Evans' December
23, 2014 affidavit in support of a warrant to search a number of cell phones recovered by
the police during their narcotics investigation, which states:

> On November 30, 2014, a car owned by Oliver was stopped on the
> Crosstown 62. The car was driven by Sharrod Rowe. A search warrant was
> granted by a Hennepin County Judge authorizing the search of the vehicle.
> The search found approximately six kilograms of cocaine. *A cell phone of
> Rowe's (PI number 2014-042485, line 1) was inventoried as was one found
> in the car (PI number 2013-043033, line 1).*

(Gov. Ex. 6 at 2 (emphasis added).) The italicized statement, read in context, is
ambiguous as to where the cell phone was found and whether it was "inventoried" before,
during, or after the execution of the December 2, 2014 search warrant. As explained later,
the precise timing of the cell phone's seizure is ultimately irrelevant because, regardless
of whether it was seized on November 30, 2014, or December 2, 2014, it would not be
subject to suppression on Fourth Amendment grounds.

In May 2015, a grand jury indicted Oliver, Green, and Williams for conspiring to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846. (Doc. No. 1.) Four months later, in September 2015, the grand jury returned a superseding indictment adding Rowe as a named coconspirator. (Doc. No. 114.) A warrant was then issued for Rowe's arrest. (Doc. No. 116.)

## II.  Motion to Dismiss the Indictment

Rowe has moved to dismiss the superseding indictment against him, broadly asserting that the indictment "was obtained in violation of [his] rights protected by the United States Constitution," fails to give him "proper notice of his alleged conduct to prepare a defense," and "fails to properly allege an unlawful conspiracy." (Doc. No. 148, Def.'s Mot. to Dismiss Indictment.) At the January 13, 2016 hearing, Rowe elaborated on the conclusory assertions made in his motion to dismiss. Rowe clarified that he is seeking to dismiss the indictment on the ground that it lacks a factual foundation, as there is no probable cause to believe that he knowingly possessed the cocaine found in the BMW. (Tr. 28–29.) The government countered that the grand jury has found probable cause to support the drug-conspiracy charge against Rowe and that he cannot challenge that determination in a pretrial motion to dismiss. (*Id.* at 29–30.) Although Rowe, per his own request, was granted an opportunity to brief the merits of his challenge to the indictment, he has not done so. (*See* Doc. No. 170, 1/14/16 Order 9.)

Given his failure to submit a post-hearing brief addressing his challenge to the indictment, it is not clear whether Rowe still wishes to pursue his motion to dismiss or, instead, has come to agree with the government's position. But even assuming he has no

intention of abandoning his motion, the only concrete argument that he has advanced in

support of dismissing the indictment is foreclosed by decades of jurisprudence. The

Supreme Court, surveying nearly a century of its own precedent, has explained:

> This Court has often recognized the grand jury's singular role in finding probable cause necessary to initiate a prosecution for a serious crime. An indictment fair upon its face, and returned by a properly constituted grand jury, we have explained, conclusively determines the existence of probable cause to believe the defendant perpetrated the offense alleged. And conclusively has meant, case in and case out, just that. We have found no authority for looking into and revising the judgment of the grand jury upon the evidence, for the purpose of determining whether or not the finding was founded upon sufficient proof. To the contrary, the whole history of the grand jury institution demonstrates that a challenge to the reliability or competence of the evidence supporting a grand jury's finding of probable cause will not be heard. The grand jury gets to say—without any review, oversight, or second-guessing—whether probable cause exists to think that a person committed a crime.

*Kaley v. United States*, — U.S. —, 134 S. Ct. 1090, 1097–98 (2014) (quotations,

citations, and alterations omitted). A grand jury has conclusively found probable cause to

indict Rowe for conspiring to distribute cocaine. While Rowe can challenge the

sufficiency of the evidence to prove his guilt at trial, he cannot challenge the grand jury's

probable cause determination or otherwise seek dismissal of the indictment based on his

personal views as to what the government's evidence will ultimately prove.[4] *See Costello*

---

[4]     The Court notes that, contrary to Rowe's suggestion at the motions hearing, he has not been indicted on a charge of drug possession and, thus, the government need not prove that he knowingly possessed the cocaine discovered in the BMW. (*See* Tr. 28.) Rowe has been charged with conspiring to distribute cocaine and, in order to sustain that charge, the government need only prove "an agreement between two or more people, including the defendant, for the purpose of engaging in distribution of drugs," not that Rowe "knowingly possessed and intended to distribute an illegal drug." *United States v. Frayer*, 9 F.3d 1367, 1372–73 & n.3 (8th Cir. 1993) (distinguishing the essential

(Footnote Continued on Following Page)

*v. United States*, 350 U.S. 359, 409 (1956) ("An indictment returned by a legally constituted and unbiased grand jury . . . is enough to call for trial of the charge on the merits."); *United States v. Nelson*, 165 F.3d 1180, 1182 (8th Cir. 1999) ("It has long been settled that an indictment is not open to challenge on the ground that there was inadequate or insufficient evidence before the grand jury."); *United States v. Ferro*, 252 F.3d 964, 967 (8th Cir. 2001) (explaining that "federal criminal procedure does not provide for a pre-trial determination of sufficiency of the evidence" or for "dismissal of an indictment on the basis of predictions as to what the trial evidence will be" because "[t]he government is entitled to marshal and present its evidence at trial"). Therefore, Rowe's motion to dismiss the superseding indictment should be denied.

### III.  Motions to Suppress Evidence and Statements

Rowe moves to suppress the six kilograms of cocaine and cell phone recovered by the police as result of the roadside stop, search, and seizure of the BMW that he was

---

(Footnote Continued from Previous Page)

elements of a drug possession charge from a drug conspiracy charge). While proving that Rowe knew the BMW contained cocaine would certainly bolster the government's case against him, it is not absolutely essential because the "essence of a conspiracy" is simply "an agreement between two or more persons to commit an illegal act." *See United States v. Reeves*, 674 F.2d 739, 947 (8th Cir. 1982). Rowe could have entered into an agreement to distribute cocaine without having specific knowledge that the BMW he was driving on November 30, 2014, was being used to that end. Furthermore, to the extent Rowe is challenging the facial validity of the superseding indictment, it adequately states an offense against him for conspiring to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846. *See United States v. Sewell*, 513 F.3d 820, 821 (8th Cir. 2008) ("An indictment adequately states an offense if . . . it contains all of the essential elements of the offense charged, fairly informs the defendant of the charges against which he must defend, and alleges sufficient information to allow a defendant to plead a conviction or acquittal as a bar to a subsequent prosecution . . . . An indictment is normally sufficient if its language tracks the statutory language.").

driving on November 30, 2014, as well as the statements he made during the stop.[5] (*See*

Doc. No. 174, Def.'s Mem. in Supp. of Mots. to Suppress; Doc. No. 175, Def.'s Mem. in

Supp. of Mot. to Suppress Statements.) Rowe essentially seeks suppression on four

grounds. First, he contends that the stop, search, and seizure of the BMW were unlawful

because they were conducted without a warrant and no exigencies prevented the police

from first obtaining a warrant. (Doc. No. 174 at 3, 6–8.) Second, he argues that the scope

of the stop and detention surpassed constitutional bounds, as they far exceeded the

amount of time that it would have taken to check the window tint on the BMW and write

a ticket for such a minor traffic violation. (Doc. No. 175 at 5–13.) Third, he asserts that

the cell phone was the fruit of his illegal arrest and that the warrant to search the BMW

"did not contain any provision authorizing the seizure of any cell phones." (Doc. No. 174

at 9.) Finally, he maintains that the warrant to search the BMW was an "illegal

confirmatory warrant" that attempted to "legitimize the prior illegal search," which he

believes actually uncovered the cocaine, and is otherwise invalid because it was based on

an affidavit containing material omissions — namely, that the police had searched and

---

[5]    In his post-hearing memorandum in support of his motion to suppress statements,
Rowe also seeks to suppress the recorded statement that he gave at the Fifth Precinct
pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), claiming that the police
impermissibly continued to question him after he invoked his right to counsel. (Doc.
No. 175 at 13–15.) This Court is somewhat puzzled by that argument, as the parties
agreed at the motions hearing that any such challenge was moot given the government's
assertions that it will not seek to introduce Rowe's recorded interview statements in its
case-in-chief at trial. (*See* Tr. 32–37, 126, 129; 1/14/16 Order 9–10.) Nevertheless, this
Court finds that Rowe's request to suppress his interview statements is indeed moot in
light of the government's repeated representations that it does not intend to introduce
them in its case-in-chief. (*See* Tr. 32, 125–126; Doc. No. 177 at 1 n.2.)

seized the BMW on November 30, 2014, and that "the drugs were already discovered by the dog." (*Id.* at 3, 11.) The government responds that the stop, search, and seizure of the BMW were lawfully based on probable cause to believe that it contained cocaine; that the cocaine and cell phone were validly seized pursuant to the subsequent warrant to search the BMW; and that the warrant affidavit did not contain material omissions that would have affected the issuing judge's probable cause determination. (Doc. No. 177 at 5–12.)

## A.   Fourth Amendment Standards

The Fourth Amendment protects persons from "unreasonable searches and seizures," and generally demands a warrant based on probable cause and "particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Searches and seizures conducted without a warrant are "*per se* unreasonable" unless they fall within an established exception to the Fourth Amendment's warrant requirement. *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quotation omitted). Because the reasonableness of a given search or seizure "is predominately an objective inquiry," the subjective motives and intentions of the officers involved are largely irrelevant; so long as "the circumstances, viewed objectively, justify the challenged action," that action is "reasonable whatever the subject intent motivating the relevant officials." *Ashcroft v. al-Kidd*, 563 U.S. 731, —, 131 S. Ct. 2074, 2080 (2011) (quotations, brackets, and emphasis omitted).

Warrantless traffic stops are typically justified under the principles of *Terry v. Ohio*, 392 U.S. 1 (1968), which carved out exceptions to both the Fourth Amendment's warrant and probable-cause requirements for brief, investigatory detentions based on

reasonable suspicion that "criminal activity is afoot," including a traffic violation. *See Illinois v. Wardlow*, 528 U.S. 119, 119 (2000); *see also Berkemer v. McCarty*, 468 U.S. 420, 439 (1984) ("[T]he usual traffic stop is more analogous to a so-called 'Terry stop' than to a formal arrest.") (citation omitted); *United States v. Mora-Higuera*, 269 F.3d 905, 909 (8th Cir. 2001) (explaining that under *Terry*, "an investigative stop of a vehicle does not violate the Fourth Amendment if the police have reasonable suspicion that the vehicle or its occupants" have committed a traffic violation or are otherwise "involved in criminal activity"). Because *Terry* provides an exception to the usual "probable-cause requirement for limited seizures of [a] person," *United States v. Place*, 462 U.S. 696, 703 (1983), a *Terry* stop must be "reasonably related in scope to the circumstances which justified the interference in the first place" and may "not continue for an excessive period of time or resemble a traditional arrest," *Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cty.*, 542 U.S. 177, 185–86 (2004) (quotations and citations omitted). Thus, where the sole justification for a stop is a suspected traffic violation, its scope cannot exceed "the time reasonably required to complete the mission" of addressing the traffic violation and "issuing a warning ticket." *Rodriguez v. United States*, — U.S. —, 135 S. Ct. 1609, 1614–15 (2015) (quotation and brackets omitted). While the occupants of a car may, consistent with *Terry*, "be detained while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation," including asking questions about their travel itinerary, inspecting licenses and vehicle registration, and checking for outstanding warrants, *United States v. Gunnell*, 775 F.3d 1079, 1083 (8th

Cir. 2015), inquiries and investigations unrelated to the purpose of the stop may not

"measurably extend [its] duration," *Rodriguez*, 135 S. Ct. at 1615 (quotation omitted).

The constitutional limits imposed on *Terry* stops, however, are inapplicable if

officers have probable cause to believe that the vehicle contains contraband or that its

occupants are involved in criminal activity. *See United States v. Pratt*, 355 F.3d 1119,

1124 (8th Cir. 2004) ("[B]ecause the officers had probable cause to arrest Pratt, *Terry* is

inapplicable."); *United States v. Houston*, 892 F.2d 696, 703 (8th Cir. 1989) (holding that

because the police had probable cause to believe "that the defendants had committed or

were committing an offense," it was not "necessary to determine whether a *Terry* stop

was justifiable"); *United States v. Childs*, 277 F.3d 947, 953 (7th Cir. 2002) (en banc)

("Because probable cause supported this stop, neither the driver nor Childs had a right to

be released the instant the steps to check license, registration, and outstanding warrants,

and to write a ticket, had been completed."); *see also Berkemer*, 468 U.S. at 439 n.29

(explaining that while "most traffic stops resemble, in duration and atmosphere, the kind

of brief detention authorized in Terry," that does not mean "that a traffic stop supported

by probable cause may not exceed the bounds set by the Fourth Amendment on the scope

of a Terry stop"). Under the "automobile exception" to the Fourth Amendment's warrant

requirement, officers may stop, search, and seize a vehicle if they have probable cause to

believe that it contains contraband or evidence of a crime. *See Coolidge v. N.H.*, 403 U.S.

443, 458 (1971); *United States v. Sims*, 424 F.3d 691, 693 (8th Cir. 2005). Probable cause

to search and seize a vehicle "exists where, in the totality of the circumstances, there is a

fair probability that contraband or evidence of a crime will be found [inside]." *United*

*States v. Vore*, 743 F.3d 1175, 1179 (8th Cir. 2014). Moreover, if officers have probable

cause to believe that the vehicle's driver has committed a crime, even one as minor as a

traffic violation, then they may arrest the driver as well. *See Atwater v. City of Lago,*

*Vista*, 532 U.S. 318, 354–55 (2001); *Peterson v. Kopp*, 754 F.3d 594, 598 (8th Cir. 2014).

Probable cause for a warrantless arrest exists "when, at the moment of the arrest, the

collective knowledge of the officers involved was sufficient to warrant a prudent man in

believing that the defendant had committed or was committing a crime." *Houston*, 892

F.2d at 701–02 (quotations, citations, and brackets omitted).

**B.      The Stop, Search, and Seizure of the BMW were Lawfully Based on Probable
          Cause**

Rowe's challenge to the scope and duration of his detention hinges on the notion

that this case involves a traditional *Terry*-type traffic stop, justified at its inception solely

by Trooper Thul's apparent observation of "a minor traffic infraction regarding window

tint" and which therefore could not exceed the time reasonably required to investigate

that traffic violation and issue a ticket. (*See* Doc. No. 175 at 6–12.) While it is true that a

"routine traffic stop" for a traffic violation is "more analogous to a so-called *Terry* stop

than to a formal arrest," *Rodriguez*, 135 S. Ct. at 1614 (quotation and ellipsis omitted),

this was not a typical or routine traffic stop justified by the mere observation of a traffic

violation. *See Childs*, 277 F.3d at 953 ("[A]lthough traffic stops usually proceed like

*Terry* stops, the Constitution does not require this equation. Probable cause makes all the

difference . . . traffic stops supported by probable cause are arrests, with all the

implications that follow from probable cause to believe that an offense has been

committed."). Instead, the stop, search, and seizure of the BMW were objectively

justified by the existence of probable cause to believe that the vehicle contained cocaine.

Thul's personal practice of developing her own independent basis for conducting a traffic

stop—in this case unlawfully tinted windows—does not erase or otherwise dwarf that

probable cause. *See United States v. Herrera-Gonzalez*, 474 F.3d 1105, 1109 (8th Cir.

2007) ("[T]he constitutional reasonableness of a traffic stop does not depend on the

actual motivations of the officer involved, and the subjective intentions of the officer

making the stop are irrelevant in determining the validity of the stop.").

Before the BMW was even stopped on the interstate, the police had information

from the CI that it was transporting a large quantity of cocaine. That tip was sufficiently

reliable to establish probable cause to believe that narcotics or other evidence of drug

trafficking would be found in the BMW; not only did the CI have a track record of

providing reliable information to the police, but he accurately predicted that Oliver would

be shipping cocaine to Minneapolis via priority mail and that his BMW would be arriving

in Minneapolis from Arizona on November 30, 2014. *See United States v. Winarske*, 715

F.3d 1063, 1067 (8th Cir. 2013) (explaining that an informant's tip may be "sufficiently

reliable to support a probable cause determination" where the informant "has provided

reliable information in the past," where his "information is at least partly corroborated,"

or where he provides "predictive information about a meeting time or place"). Based on

this probable cause to believe that the BMW contained cocaine, the police were

authorized under the automobile exception to stop, search, and seize the vehicle without a

warrant. Contrary to Rowe's suggestion, whether the police could have obtained a

16

warrant before stopping the BMW is immaterial because "the automobile exception does not have a separate exigency requirement: If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment permits police to search the vehicle without more." *Maryland v. Dyson*, 527 U.S. 465, 467 (1999) (quotation and ellipsis omitted); *see also Pennsylvania v. Labron*, 518 U.S. 938, 939–40 (1996) (rejecting the notion that the automobile exception does not apply when the police have time to secure a warrant because the exception is based solely on a vehicle's "ready mobility" and "the individual's reduced expectation of privacy in an automobile"); *United States v. Blaylock*, 535 F.3d 922, 926 (8th Cir. 2008) ("No exigency beyond that created by the ready mobility of an automobile is required for a warrantless search of a car to fall within the [automobile] exception.").

The police were also permitted to arrest Rowe, assuming that his detention amounted to a *de facto* arrest, based on probable cause to believe that as the driver of the BMW he was involved in illicit drug activity. The probable cause to believe that the car contained cocaine, coupled with Rowe's status as the vehicle's driver, provided reasonable grounds for believing that he "had knowledge of, and exercised dominion and control over, the cocaine." *See Maryland v. Pringle*, 540 U.S. 366, 372 (2003) (holding that officers had probable cause to arrest an occupant of car containing cocaine because it would have been "entirely reasonable" to infer that he "had knowledge of, and exercised dominion and control over, the cocaine"). Because the warrantless stop, search, and seizure of the BMW, as well as Rowe's detention, were all permissible based on the presence of probable cause, none of the evidence or statements taken at that time or

pursuant to the subsequent search warrant for the BMW are subject to suppression as the fruit of an unconstitutional search or seizure.[6] And given the existence of such probable cause, this Court need not decide whether the scope of the stop was otherwise permissible under *Terry*. *See Pratt*, 355 F.3d at 1124 ("[B]ecause the officers had probable cause . . . , *Terry* is inapplicable."); *Childs*, 277 F.3d at 953 (concluding that because probable cause supported a stop and seizure, it was "unnecessary" to decide whether it would have exceeded the limits of *Terry* absent that probable cause).

## C.   Rowe is Not Entitled to a *Franks* Hearing to Challenge the Validity of the BMW Search Warrant

That leaves Rowe's claim that any evidence seized pursuant to the search warrant should be suppressed because the supporting affidavit failed to inform the issuing judge that the police had already searched and seized the BMW and "that the drugs were already discovered by the dog." (Doc. No. 174 at 11.) In essence, Rowe is challenging the validity of the search warrant under *Franks v. Delaware*, 438 U.S. 154 (1978), which allows a criminal defendant to "request a hearing to challenge a search warrant on the ground that the supporting affidavit contains factual misrepresentations or omissions relevant to the probable cause determination." *United States v. Arnold*, 725 F.3d 896, 898

---

[6]   As alluded to earlier, this is why the timing of the cell phone's seizure does not matter in this case. If the phone was seized before the police obtained the warrant to search the BMW on December 2, 2014, that seizure was not, as Rowe contends, the fruit of an illegal arrest. And if the phone was seized during the execution of the search warrant, the warrant specifically authorized the police to seize "[n]arcotics" as well as "[d]ocuments, mailings, keys, address books, *cell phones (and content)*, receipts, bills, rental agreements, photographs, notes and other media." (Gov. Ex. 1 (emphasis added).) The record belies Rowe's assertion that "[t]he warrant did not contain any provision authorizing the seizure of any cell phones." (Doc. No. 174 at 9.)

(8th Cir. 2013). Rowe, however, has not requested a *Franks* hearing and his current

challenge to the contents of the warrant affidavit is both untimely and beyond the scope

of the issues raised in his underlying motion and addressed at the suppression hearing.

Rowe did not raise a *Franks* issue in his amended motion to suppress evidence or at the

motions hearing. (*See generally* Doc. Nos. 163, 179.) He first raised the issue in a post-

hearing memorandum, and he did so despite the Court's admonition that his post-hearing

memorandum was to be "limited to the specific . . . issues addressed at the motions

hearing." (*See* 1/14/16 Order 10–11.) Rowe's attempt to raise the issue at this juncture is

both untimely, as the deadline for filing pretrial motions (including a motion for a *Franks*

hearing) expired on December 7, 2015, and in contravention of the Court's order limiting

post-hearing briefing to the specific issues addressed at the suppression hearing. (*See*

Doc. No. 141, 11/06/15 Order ¶ 3.)

In any event, even if Rowe had requested a *Franks* hearing, he would not be

entitled to one because he has failed to make "a substantial preliminary showing" that

Sergeant Biederman "deliberately or recklessly included a false statement in, or omitted a

true statement from, his warrant affidavit" and that "the affidavit would not establish

probable cause if the allegedly false information is ignored or the omitted information is

supplemented." *United States v. Snyder*, 511 F.3d 813, 816 (8th Cir. 2008). Contrary to

Rowe's contentions, Sergeant Biederman's warrant affidavit did, in fact, indicate that the

BMW had been stopped and impounded on November 30, 2014. (*See* Gov. Ex. 1 at 1–2.)

Although the affidavit did not mention that the BMW had been searched and that a drug

dog had alerted to the possible presence of narcotics, those facts were not "clearly critical

to the finding of probable cause," such that this Court can infer that Sergeant Biederman

omitted them "with the intent to make, or in reckless disregard of whether they made, the

affidavit misleading." *See United States v. Jacobs*, 986 F.2d 1231, 1234–35 (8th Cir.

1993). Including information about the search and the positive canine alert would not

have undercut a finding of probable cause; instead, it would have bolstered the basis for

believing that the BMW contained narcotics. In addition, and again contrary to Rowe's

suggestion, no drugs were actually found in and recovered from the BMW until after the

search warrant was obtained. The roadside search only yielded a canine alert for the

possible presence of narcotics, not the narcotics themselves or definitive proof of their

existence. Because the omissions cited by Rowe are either unsupported by the record or

would not have affected the issuing judge's probable cause determination, he has not

made the substantial preliminary showing required to warrant a *Franks* hearing and

ultimately establish a *Franks* violation.

## RECOMMENDATION

Based on the foregoing, and on all of the files, records, and proceedings herein, **IT

IS HEREBY RECOMMENDED** that:

1.      Defendant Sharrod Rowe's Motion to Dismiss the Indictment (Doc. No.

148) be **DENIED**;

2.      Rowe's Amended Motion to Suppress Statements, Admissions and

Answers (Doc. No. 162) be **DENIED**; and

3.      Rowe's Amended Motion to Suppress Evidence (Doc. No. 163) be

**DENIED**.

Date:  February 11, 2016

 *s/ Becky R. Thorson*
BECKY R. THORSON
United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b), any party may file and serve specific written objections to this Report and Recommendation by **February 18, 2016**. A party may respond to those objections within **seven days** after service thereof. All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 7 days from the date of its filing. If timely objections are filed, this Report will be considered under advisement from the earlier of: (1) 7 days after the objections are filed; or (2) from the date a timely response is filed.